Argued December 3, 1973, affirmed January 24, 1974

SANDERS, *Appellant, v.* CITY CENTER LUMBER
COMPANY ET AL, *Respondents.*

518 P2d 1032

*Ridgway K. Foley, Jr.,* Portland, argued the cause
for appellant. With him on the briefs were Wayne A.

Williamson, and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

*Frank E. Day,* Portland, argued the cause for respondent City Center Lumber Company. With him on the brief were Day & Prohaska, P. C., Portland.

*Ronald M. Somers,* The Dalles, argued the cause and filed a brief for respondent Clifton Claggett.

Dick & Dick, The Dalles, filed a brief for respondent Irl Davis, Jr.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, HOWELL and BRYSON, Justices.

## HOLMAN, J.

Plaintiff, as the widow and personal representative of the estate of her husband, brought an action to recover damages for his negligently caused death. All defendants filed supplemental pleadings, each defendant claiming that at the time and place of decedent's death it and the employer of plaintiff's decedent were subject to the Workmen's Compensation law and were engaged in a common enterprise on premises over which they had joint supervision and control, as defined in ORS 656.154. As a consequence, each defendant claims it is immune from plaintiff's action in accordance with the provisions of that statute. A separate trial was had to the court upon the supplemental pleadings as provided by ORS 656.595 (3). The trial court, in each instance, found for the defendant and plaintiff appealed.

The defendant Davis owned land on the shore of Pine Hollow Lake in Wasco County on which he

was developing homesites, as well as a park for public use. He entered into a contract with City Center Lumber Co. (City Center) to build for him a combination bathhouse, lavatory, and laundromat (washhouse) in the park. Davis undertook to be responsible for the plumbing, septic tank, and drain field, while City Center was to do the rest of the work. City Center subcontracted most of the construction to several others. However, it did employ the defendant Claggett at $10 per hour to do the electrical work.

Because of the remoteness of the area and the number of subcontracts, the building took longer than normal to complete, and, at times, between various portions of the work, there would be no one on the job at all. One of the first workmen present was the plumber, who had to lay the underground plumbing before the cement slab upon which the building was to rest could be poured. Because he needed power to operate electrical pipe threading and cutting tools, a large, heavy extension cord was made pursuant to the authority of City Center and paid for by it. This cord was plugged into an electric outlet on a pole which serviced a trailer house used by Davis' park manager and salesman as an office and living quarters. The cord was laid on the ground from the trailer house to the place where the washhouse was being constructed, a distance of about 125 feet. This cord was thereafter used as a source of power for all persons who used electric tools in their part of the construction.

Approximately a week before the accident in question the defendant Claggett, the electrician, came and wired the building. In the evening when he left he was asked by Davis or his park manager if it was possible to energize the building's electrical system so

that a Coke machine could be utilized to furnish cold drinks to workmen and so the lights in the building would operate. Some workmen were finishing the inside of the building at night rather than in the afternoon when it was extremely warm. Claggett took the wires from an uncompleted electric outlet on the inside of the building and connected them with the extension cord, thus energizing the building's electrical system.

Thereafter, Wasco Electric Co-op (Wasco) was asked to furnish electricity to the building, and plaintiff's decedent, together with another workman, was sent to make the connection. Seventy-nine feet from the washhouse was another utility pole on which there was an electric power line packing 7200 volts. The connection required the installing of a transformer on the pole to reduce the current from the power line and the stringing of a line from the pole to the washhouse. Before any connection was made to the power line, the line was run from the electric connection on the outside of the washhouse to the pole and connected to the transformer which had been installed upon it. Another wire had been run out of the transformer and was presumably dead because no connection had yet been made with the power line. However, unknown to plaintiff's decedent, the building's electrical system had been energized by means of the extension cord and there resulted a "feed-back" through the line that had been connected from the building to the transformer. The reverse flow through the transformer stepped up the 120 volts in the washhouse to approximately 7200 volts. Plaintiff's decedent came in contact with the wire which had been run out of the transformer, was knocked off the pole, and received fatal injuries. Because of the way the linemen were dressed

and the dryness of the surrounding area, the 120 volts coming from the washhouse were insufficient to make the men previously aware that the electric circuit of the washhouse was already energized when they connected to it.

At the time of the accident Davis' employee was in his trailer; Davis' son, who helped around the park and who had previously assisted in installing the septic tank and drain field for the washhouse, was around the premises. Two men were in the washhouse installing a water heater for the gas company, presumably at the request of either Davis or City Center. Shortly after the accident, the decedent's employer was notified and two of its other employees, while on their way to the premises, met the ambulance taking plaintiff's decedent to the hospital. These employees walked into the washhouse, saw the offending connection between the extension cord and the building, and jerked it loose. As they did so, one of two workmen who were putting up wallboard inside the building remarked, "I guess we can't work any more, they cut off our electricity." Where these workmen were at the time of the accident or how long they had been on the job is not disclosed.

ORS 656.154 provides:

"Injury due to negligence or wrong of a person not in the same employ as injured workman; remedy against such person. (1) If the injury to a workman is due to the negligence or wrong of a third person not in the same employ, the injured workman, or if death results from the injury, his widow, children or other dependents, as the case may be, may elect to seek a remedy against such third person. However, no action shall be brought against any such third person if he or his workman

causing the injury was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman and was an employer subject to ORS 656.001 to 656.794.

"(2) As used in this section, 'premises' means the place where the employer, or his workman causing the injury, and the employer of the injured workman, are engaged in the furtherance of a common enterprise or the accomplishment of the same or related purposes in operation.

"* * * * * *"

The above statutory provisions have been interpreted by this court in *Bass v. Dunthorpe Motor Trans.*, 258 Or 409, 484 P2d 319 (1971), as follows:

"In order for an action to be barred by the statute, the defendant must show (1) that he was an employer subject to the Workmen's Compensation Act; (2) that he or his workmen causing injury had joint supervision and control with the injured workman's employer of the premises on which the injury occurred; and (3) that he and the injured workman's employer were engaged in the furtherance of a common enterprise or in the accomplishment of the same or related purposes in operation, which means that the injured workman must have been working with the employees of the tort feasor in a common activity and exposed to the hazards created by such mutual engagement of the employers. *Fisher v. Rudie Wilhelm Warehouse Co.*, 224 Or 26, 35, 355 P2d 242 (1960). *Johnson v. Timber Structures, Inc.*, 203 Or 670, 281 P2d 723 (1955)." 258 Or at 411-12.

It is agreed that the employer of plaintiff's decedent and defendants Davis and City Center were employers subject to the provisions of the Workmen's Compensation Act and that the defendant Claggett was an employee of City Center.

■ Plaintiff contends there was no joint supervision and control by decedent's employer and the defendants. She argues that defendants had no control of the work Wasco was performing in making the electrical connection and that Wasco had no control of the construction of the washhouse. It is immaterial to joint supervision and control that one employer has no right to supervise the activities of the workmen of another employer. Also, joint supervision and control can exist even though it may be said that only one of the covered employers has actual control of the site where the work is underway. *Deitz v. Savaria, Smith,* 260 Or 538, 542, 491 P2d 620 (1971). *Pruett v. Lininger et al,* 224 Or 614, 623, 356 P2d 547 (1960). What is intended by joint supervision and control is defined in *Deitz v. Savaria, Smith, supra* at 542-43:

> "The term 'joint supervision and control' describes a situation in which each employer has control of his employees' activities and, thus, through them has some control of the conditions under which his employees and the employees of the other employer must work * * *."

*Accord, Bass v. Dunthorpe Motor Trans., supra* at 414. This is the only meaning which will justify the many cases which have applied the prohibition of the statute where the employers cannot be said to have had supervision and control of the premises except that they were engaged in controlling some work which was being carried on there.

■ All employers here involved, through the acts of their employees, had the ability to influence the conditions under which the work progressed. The defendants demonstrated their ability to influence these conditions—with fatal result to plaintiff's decedent. Wasco's employees also had the ability to influence the

condition of those persons working about the building. They could have turned 7200 volts of electricity into the building.

Plaintiff also contends there was no joint supervision and control because, at the time of the accident, there was no intimate commingling of workmen which contributed to any accident or the hazard suffered by plaintiff's decedent. This contention demands an analysis of the kind of commingling that is required. *Deitz v. Savaria, Smith, supra,* encompassed a situation in which a building inspector, while inspecting during construction, was injured by a faulty scaffolding built by defendant's employees. There was no indication that at the particular time of the accident he was in the company of or was intimately commingling with any of defendant's employees, though they were around the premises, or that their current actions contributed in any way to plaintiff's injury. In *Tidyman v. Industrial Air Prod. Co.,* 266 Or 170, 512 P2d 792 (1973), defendant engaged plaintiff's employer to repair a leak in a large, liquid oxygen tank on defendant's premises. Defendant agreed to purge the tank, to build the scaffolding over the tank for use in its repair, and to furnish the welding equipment and a helper. When defendant notified plaintiff's employer that the tank was ready to be repaired, plaintiff and another employee appeared at defendant's premises the first thing one morning to do the work. Some of defendant's employees were around the premises, but not one of them engaged himself in helping plaintiff work on the tank. The helper who was to be furnished by defendant was not on the job. After plaintiff's companion left to secure additional equipment and while plaintiff was burning ice off the tank with a torch, a fire occurred

because the tank had not been properly purged and plaintiff was injured.

In each of these cases the court held there was joint supervision and control. Each demonstrates that it is not necessary that the employees of both employers be actively engaged at the time of plaintiff's injuries in working immediately adjacent to or with plaintiff in the work then in progress. In *Tidyman* none of defendant's employees were engaged, at the time of the accident, in the joint work which was being carried on. In both *Tidyman* and *Deitz* the plaintiff was injured not as the result of the then current actions of the defendant's workmen but as the result of a dangerous condition of the premises occasioned by their prior negligence. These cases negate plaintiff's contention.

The most that can be claimed for plaintiff's position is that it can be asserted that there were no employees of City Center present at the time of the accident and that those who were present were employees of independent contractors. Claggett, the electrician, an employee of City Center, who originally energized the washhouse's electrical system, had not been on the premises for a week prior to the accident although he had not completed all of his work. However, it was City Center's and Davis' control of the condition of the premises through the activity of Claggett in energizing the electrical system at Davis' or his manager's request that resulted in the dangerous condition which caused the death.

The progenitor of *Deitz* and *Tidyman* is *Thomas v. Foglio,* 225 Or 540, 358 P2d 1066 (1961). That case did not involve the Workmen's Compensation Act but, rather, the Employers' Liability Law. However, it

recognized the similarity of the language "persons having charge of, or responsible for, any work * * *" of the Employers' Liability Law with the supervision and control provisions of the Workmen's Compensation Act. In that case, defendant could be found to have been the operator of a logging truck from which a platform had been omitted. The platform, had it existed, could have been used in times of emergency by the loader when loading the truck. While plaintiff was loading the truck and on the load, the logs began to roll and he jumped to a water tank at the back of the truck cab on top of which the safety platform was supposed to have been. The calks of his boots hit the steel tank and he fell to the ground, injuring himself. The court held that because defendant could be found to have been the operator of the truck, and therefore responsible for its condition, the jury could find that defendant was a person who had charge of or who was responsible for the work even though the loading was being controlled solely by the employer of the plaintiff, and the defendant's driver was merely a spectator at that time and not in any way responsible for the defective condition of the truck, for the loading, or for the occurrence.

It is our conclusion that "operational commingling" does not require defendant's employees to be present at the moment of accident but only that the employees of both employers be engaged in what amounts to co-operative conduct in the furtherance of a common enterprise.

The plaintiff also claims that her husband's employer and the defendants were not engaged in the furtherance of a common enterprise or in the accomplishment of the same or related purpose in operation. She argues that he performed no work on the wash-

house but was only connecting it to electricity on a pole 79 feet away. As we said in *Deitz v. Savaria, Smith, supra,* the validity of such a claim depends upon how large the court draws the circle of the activity or enterprise. We believe that the act of connecting the washhouse to a power source was as necessary to a completed and functioning washhouse as was putting in the plumbing or constructing any other part of the structure. In *Deitz* we held that the regular inspection by a city inspector of a building during construction is a required and integral part of the construction of a completed building. So is an electrical connection.

The judgment of the trial court is affirmed.